IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| STEPHEN E. CEHULA. JR., ET AL., )<br>Plaintiffs, )<br> )<br>v. )<br> )<br>JANUS DISTRIBUTORS, LLC, )<br>Defendant. ) | Civil Action No. 07-00113<br>Judge Nora Barry Fischer |

## MEMORANDUM OPINION

Plaintiffs Stephen Cehula Jr., Ann Marie Cehula, Julie Dean Cehula, and Ann Marie Cehula (hereinafter "Plaintiffs") filed the instant civil action against Defendant Janus Distributors, LLC (hereinafter "Defendant" or "Janus"), alleging violations of the Pennsylvania Unfair Trade Practice/Consumer Protection Law ("UTP/CPL") stemming from Plaintiffs' investments with Defendant.[1] Pending before the court is Defendant Janus Distributors LLC's Motion for Summary Judgment [50].

At the outset, the Court notes Plaintiffs' violation of Rule 56.1(c) of the Local Rules of this Court ("L.R. 56.1(c)").[2] Plaintiff did not respond to Defendant's Statement of Material Facts and

---

[1] In their initial and Amended Complaints, Plaintiffs alleged claims for common law fraud and breach of contract. On April 28, 2008, the parties stipulated to the dismissal of said claims. (*See* Docket No. 44).

[2] Rule 56.1(c)(1) of the Local Rules of the United States District Court for the Western District of Pennsylvania mandates that the opposing response to a motion for the summary judgment include:

> A separately filed concise statement, which responds to each numbered paragraph in the moving party's Concise Statement of Material Facts by:

failed to file a separate statement of material facts as required by Local Rule 56.1(c)(1). Instead, Plaintiffs have included a brief factual background section in the beginning of their Opposing Response Brief.[3] (Docket No. 54). Thus, the facts, as set forth in Defendant's Statement of Material Facts ("SMF") (Docket No. 51), are deemed to be admitted by Plaintiff for the purpose of the instant motion, in accordance with Local Rule 56.1(e). *See Jankowski v. Demand,* 2008 WL 190134, at *1 (W.D.Pa 2008); *GNC Franchising LLC v. Kahn,* 2008 WL 612749, at *1 (W.D. Pa 2008); *Ferace v. Hawley*, 2007 WL 2823477, at *1 (W.D. Pa 2007) (*citing Benko v. Portage Area School Dist.*, 2006 WL 1698317 (W.D. Pa 2006); *Smith v. Burrows Corp.*, 2005 WL 2106594 (W.D. Pa 2005); *Loving v. Borough of East McKeesport*, 2005 WL 3560661 (W.D. Pa 2005). After careful consideration and for the reasons that follow, the Court grants Defendant's motion for summary judgment.

---

(a) admitting or denying whether each fact contained in the moving party's Concise Statement of Material Facts is undisputed and/or material;

(b) setting forth the basis for the denial if any fact contained in the moving party's Concise Statement of Material Facts is not admitted in its entirety (as to whether it is undisputed or material), with appropriate reference to the record (*See* LR 56.1(b)(1) for instructions regarding format and annotation); *and*

(c) setting forth in separately numbered paragraphs any other material facts that are allegedly at issue, and/or that the opposing party asserts are necessary for the court to determine the motion for summary judgment[.]

W.D. Pa L. R. 56.1(c)(1) (emphasis added).

[3] In addition, throughout Plaintiffs' factual background section of their Opposing Response Brief, Plaintiffs failed to include citations to any evidence of record when making factual assertions, also in violation of L.R. 56.1(B)(1).

## FACTS[4]

Defendant is a broker-dealer that facilitates the distribution of shares of mutual funds managed by Janus Capital Management LLC, a subsidiary of Janus Capital Group Inc. Defendant's Facts at ¶1. On or about March 26, 1992, Mr. Cehula[5] opened an Individual Retirement Account ("IRA") with Defendant with a total investment of $6,846.00.[6] Defendant's Facts at ¶15-16. On or about July 11, 1995, Mr. and Mrs. Cehula[7] opened a Joint Tenant Account with Right of Survivorship with Defendant investing $10,000.00.[8] Defendant's Facts at

---

[4] Given Plaintiffs' failure to respond appropriately to Defendant's SMF, the facts asserted by Defendant are deemed admitted and are the facts relied up by this Court in making its rulings.

[5] Mr. Cehula, who studied engineering in college, has been active in the Western Pennsylvania business community since he started his own construction business in 1980. Defendant's Facts at ¶¶4-9. He has also owned and operated a bar and managed a motel and convenience store. Defendant's Facts at ¶¶10-11. Mr. Cehula currently owns and operates SC Builders, a real estate development company that builds homes and develops subdivisions. Defendant's Facts at ¶12.

[6] After receiving a prospectus for each fund, Mr. Cehula chose to invest $2,000.00 in Defendant's "Worldwide Fund" and $4,846.00 into Defendant's "Twenty Fund." Defendant's Facts at ¶17-18. While holding his IRA with Defendant, Mr. Cehula contributed a total of $31,846.00 to his IRA and made exchanges of shares in different mutual funds on thirty-four (34) occasions. Defendant's Facts at ¶39-40.

Contained in the application for his IRA account, as well as all other accounts held with Defendant, is a clause stipulating that Defendant shall not be liable for "any loss, cost, or expense" associated with acting on instructions provided by an account holder, provided that Defendant "employs reasonable procedures" that any such instructions are genuine. (Docket No. 53-3 at 7-8; Docket No. 53-5 at 15-16; Docket No. 53-8 at 27-30.

[7] Mrs. Cehula, obtained a bachelors's degree from Edinboro University and a teaching certificate from California University of Pennsylvania, has been continuously employed as a teacher by the Albert Gallatin School District since 1976. Defendant's Facts at ¶¶7-8.

[8] Mr. Cehula chose to invest all $10,000.00 in the Twenty Fund, after receiving the corresponding prospectus from Defendant. Defendant's Facts at ¶21-22. While holding their Joint

3

¶20-21. Prior to opening this account, Plaintiffs had no problems or complaints associated with any product or service provided by Defendant. Defendant's Facts at ¶24. On or about March 23, 1999, Mrs. Cehula opened her own IRA with Defendant investing $77,906.15.[9] Defendant's Facts at ¶25-26. Finally, on or about December 7, 1999, Mr. Cehula opened a Uniform Gift to Minors Account, as a custodian of his daughter, Julie Dean, with an initial investment of $20,000.00.[10] Defendant's Facts at ¶29-30. Prior to opening their daughter's account, Plaintiffs had no problems or complaints associated with Defendant. Defendant's Facts at ¶32.

Throughout the Plaintiffs' relationship with Defendant, Mr. Cehula dealt exclusively with Defendant and was solely responsible for the selection of mutual funds which he purchased.[11]

---

Account with Defendant, Mr. and Mrs. Cehula contributed a total of $515,300.00 to their Joint Account and made exchanges of shares in different mutual funds on ninety-two (92) occasions. Defendant's Facts at ¶41-42.

[9] Mrs. Cehula choose to invest $25,968.72 into the Twenty Fund, $25,968.72 into Defendant's "Olympus Fund," and $25,968.71 into Defendant's "Global Technology Fund." Defendant's Facts at ¶26. According to Mr. Cehula, while this IRA bears his wife's name, he had ninety-nine percent of the input when selecting in which funds to invest. (Docket No. 53-6, Defendant's Exhibit 2, S. Cehula Deposition, at 44:1-4). While holding her IRA with Defendant, Mrs. Cehula contributed a total of $85,202.61 to her IRA and made exchanges of shares in different mutual funds on 21 occasions. Defendant's Facts at ¶43-44.

[10] Mr. Cehula chose to invest all $20,000.00 in Defendant's "Money Market Fund." Defendant's Facts at ¶30. He made no other contributions while holding this fund with Defendant but made two exchanges of shares in different mutual funds. Defendant's Facts at ¶45-46.

[11] During the time in which Plaintiffs maintained their accounts with Defendant, Mr. Cehula was also investing directly in the stock market. Defendant's Facts at ¶47. According to Mr. Cehula, many of his investment ideas were the result of phone conversations with a Janus representative in which Mr. Cehula would ask which of Defendant's mutual fund options were purchasing stock from those companies from when he was directly purchasing stock. Defendant's Facts at ¶53; S. Cehula Deposition at 44:18-25; 45:1-5, 21-25; 46:1-25; 47:1-3.

Defendant's Facts at ¶33-38. When selecting funds associated with an account in Mrs. Cehula's name, Mr. Cehula acted with his wife's consent. Defendant's Facts ¶33-38. Before investing in any fund with Defendant, Mr. Cehula would call a Janus phone representative to ask questions about a particular fund and receive that fund's corresponding prospectus.[12] Defendant's Facts at ¶51. Janus phone representatives would "select" a majority of the funds "following what [he] was asking for," and inform Mr. Cehula if the fund conformed to what he desired or if the fund purchased stocks from a company in which he expressed interest. Defendant's Facts at ¶54. If satisfied with the answers or information received from the Defendant's phone representative(s) and the information contained in a fund's prospectus, Mr. Cehula would then send Defendant a check to purchase shares in the fund.[13] Defendant's Facts at ¶51-52. According to Mr. Cehula, Defendant's phone representatives were always "very good" at explaining the mutual funds he was interested in purchasing.[14] Defendant's Facts at ¶55; S. Cehula Deposition, at 36:24-25; 37:1-5. Defendant made no misrepresentations of fact with respect to any of the mutual funds which Plaintiffs purchased. Defendant's Facts at ¶56, S. Cehula Deposition, at 94:11-25; 95:1-

---

[12] Mr. Cehula admits that he never read through a prospectus received from Defendant thoroughly, if at all. Defendant's Facts at ¶52; S. Cehula Deposition at 25:15-24.

[13] When dealing with Defendant's phone representatives, it was always Mr. Cehula's option whether to finally purchase any mutual fund discussed. Defendant's Facts at ¶54; S. Cehula Deposition at 78:13-25; 79:1-25; 80:1-23.

[14] Despite failing to comply with Local Rule 56.1(c), the Court recognizes that Plaintiffs contend that throughout their relationship with Defendant, they regularly asked for a "personal investment advisor" to help with the selection of funds, but were told they had to meet increasing investment thresholds before qualifying for such an advisor. Defendant's Facts at ¶62-68; Docket No. 45 at 1-2.

24. Mr. Cehula admits the same. *Id.*

On January 24, 2003, pursuant to a telephone directive given by Mr. Cehula, Plaintiffs liquidated all four of their accounts with Defendant.[15] Defendant's Facts at ¶57-58. According to Mr. Cehula, he chose to liquidate the accounts at this time because the market was "stagnant." Defendant's Facts at ¶60, S. Cehula Deposition at 152:10-20.

## PROCEDURAL HISTORY

On January 30, 2007, the Plaintiffs commenced the instant action by filing a Complaint in which they alleged common law fraud and deceit, violations of the UTP/CPL, 73 Pa. C.S.A. 201-1, *et. seq.,* and breach of contract. (Docket No. 1). On April 10, 2007, before Defendant filed a responsive pleading, Plaintiffs filed an Unopposed Motion for Leave to Amend Complaint, which the Court granted. (Docket No. 6). On May 3, 2007, Plaintiffs filed an Amended Complaint, to which they attached copies of applications allegedly entered into between Plaintiffs and Defendant. (Docket No. 8).

On June 6, 2007, Defendant filed a Motion to Dismiss the Amended Complaint pursuant to

---

[15] Notwithstanding their failure to comply with Local Rule 56.1(c), the Court acknowledges that Plaintiffs allege that at some point in 2001, prior to Plaintiffs' final liquidation on January 24, 2003, Mr. Cehula requested that their four accounts with Defendant be liquidated during a 2001 phone call with phone representatives of Defendant. (Docket No. 32 at 8). Plaintiffs contend that this failure to liquidate their accounts in 2001 resulted in a loss of over $590,000.00. (Docket No. 54 at 14). Plaintiffs further allege that when attempting to liquidate their accounts with Defendant in 2001, they were given a "guarantee" by an unnamed Janus phone representative that the value of their accounts would grow to $10,000,000.00. Defendant's Facts at ¶69-76; Docket No. 32 at 17. According to Mr. Cehula, he was given no time frame as to when the value of Plaintiffs' funds would reach this $10 million figure. Defendant's Facts at ¶78; Docket No. 53-6, Defendant's Exhibit 2, at 133-134. In his deposition, Mr. Cehula states that the only time he received any $10 million guarantee was during this 2001 phone call. Defendant's Facts at ¶85; S. Cehula Deposition at 111:20-25; 112:1-2, 18-21.

6

Fed. R. Civ. P. 12(b)(6).[16] (Docket No. 12). On November 2, 2007, the Court granted Defendant's Motion to Dismiss the Amended Complaint and granted Plaintiffs leave to amend their Amended Complaint. (Docket No. 29). On December 6, 2007, Plaintiffs filed a Second Amended Complaint. (Docket No. 32). On December 24, 2007, Defendant filed its Motion to Dismiss the Plaintiffs' Second Amended Complaint pursuant to Fed. R. Civ. P. 12(b)(6).[17] (Docket No. 33). On February 19, 2008, the Court denied Defendant's Motion to Dismiss, concluding that the instant dispute should proceed through discovery in order to shed light on the specifics of Plaintiffs' claims. (Docket No. 39).

On March 10, 2008, Defendant filed its Answer and Affirmative Defenses to the Second Amended Complaint. (Docket No. 40). On April 25, 2008, the Court granted the parties' stipulation of dismissal of Count I (common law fraud and deceit) and Count III (breach of contract) of the Second Amended Complaint, with prejudice. (Docket No. 44). On May 13, 2008, the Court confirmed the parties' stipulation as to the waiver of the right to a jury trial. (Docket No. 47).

On May 27, 2008, Defendant filed the instant motion for summary judgment. (Docket No. 50). On June 22, 2008, Plaintiffs filed Plaintiffs' Opposition to Defendant's Motion for Summary Judgment. (Docket No. 54). On July 7, 2008 Defendant filed Defendant's Reply Memorandum of

---

[16] Defendant argued that Plaintiffs' Amended Complaint failed to state their claims with sufficient particularity as required under Rule 9(b).

[17] Defendant argued that Plaintiffs' Second Amended Complaint was still devoid of the necessary particularity required under Rule 9(b) and that Plaintiffs' common law fraud and breach of contract claims were barred by the applicable statute of limitations.

Law in Support of Motion for Summary Judgment.[18] (Docket No. 56).

## STANDARD OF REVIEW

Summary judgment may only be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Pursuant to Rule 56, the Court must enter summary judgment against

---

[18]

In their reply, Defendant raises the applicability of the sham affidavit doctrine to the affidavits attached to Plaintiffs' Opposition to Defendant's Motion for Summary Judgment. (Docket No. 56 at 3-4). A sham affidavit "is a contradictory affidavit that indicates only that the affiant cannot maintain a consistent story or is willing to offer a statement solely for the purposes of defeating summary judgment." *See Jiminez v. All American Rathskeller, Inc.*, 503 F.3d 247, 253 (3d. Cir. 2007) (holding that an affidavit that conflicted with the affiant's testimony and other evidence did not raise a genuine issue of fact to defeat summary judgment). A sham affidavit "cannot raise a genuine issue of fact because it is merely a variance from earlier deposition testimony, and therefore no reasonable jury could rely on it to find for the nonmovant." *Id*. Furthermore, "when a party does not explain a contradiction between a subsequent affidavit and a prior deposition, it is appropriate for the district court to disregard the subsequent affidavit as a "sham," therefore not creating an impediment to grant a summary judgment based on the deposition. *Hackman v. Valley Fair*, 932 F.2d 239, 241(3d Cir. 1991). Moreover, when there is no independent evidence on the record to support an otherwise questionable affidavit, courts may disregard the affidavit. *Baer v. Chase*, 392 F.3d 609, 625 (3d Cir. 2004).

Here, Mr. and Mrs. Cehula were both deposed at length. The affidavits submitted by Plaintiffs directly contradict their prior deposition testimony. For example, Plaintiffs allege that Mr. Cehula had no authority to act with respect to Mrs. Cehula's IRA account. Ann Marie Cehula Affidavit ¶¶4-9. This is in direct contradiction with Mrs. Cehula's prior deposition testimony. A. Cehula Deposition at 17:19-25; 18:1-3. Plaintiffs also allege that Defendant refused to honor a number of sell orders. S. Cehula Affidavit ¶¶12-13. This is also in direct contradiction with Mr. Cehula's prior deposition testimony in which he states that the only time Defendant ever refused a sell order was during the alleged phone call in the winter of 2001. S. Cehula Deposition at 111:20-25; 112:12-24.

Because Plaintiffs' affidavits are in direct contradiction to their prior deposition testimony and are unsupported by other independent evidence, and because the Plaintiffs have not explained the contradiction, the Court finds that the affidavits submitted by Plaintiffs in conjunction with their Opposition to Defendant's Motion for Summary Judgment fall under the sham affidavit doctrine and will not be considered competent evidence or create a genuine issue of material fact to survive summary judgment.

the party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A motion for summary judgment will not be defeated by the mere existence of some disputed facts, but will be defeated when there is a genuine issue of material fact. *Anderson v. Liberty Lobby*, 477 U.S. 242 (1986).

In evaluating the evidence, the Court must interpret facts in the light most favorable to the non-moving party, and draw all reasonable inferences in their favor. *Watson v. Abington Twp.*, 478 F.3d 144, 147 (3d Cir. 2007). Initially, the burden is on the moving party to demonstrate that the evidence in the record creates no genuine issue of material fact. *Conoshenti v. Public Serv. Elec. & Gas Co.*, 364 F.3d 135, 140 (3d Cir. 2004). The dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *McGreevy v. Stroup*, 413 F.3d 359, 363 (3d Cir. 2005). In determining whether the dispute is genuine, the court's function is not to weigh the evidence or to determine the truth of the matter, but only to determine whether the evidence of record is such that a reasonable jury could return a verdict for the non-moving party. *Id.* at 249. "The court may consider any material or evidence that would be admissible or usable at trial in deciding the merits of a motion for summary judgment." *Turner v. Leavitt*, Civil Action No. 05-942, 2008 WL 828033, at *4 (W.D. Pa. March 25, 2008) (citing *Horta v. Sullivan*, 4 F.3d 2, 8 (1st Cir. 1993) (citing 10 WRIGHT AND MILLER, FEDERAL PRACTICE § 2721 at 40 (2d ed.1983))); *Pollack v. City of Newark,* 147 F. Supp. 35, 39 (D.N.J. 1956), *aff'd*, 248 F.2d 543 (3d Cir. 1957), *cert. denied*, 355 U.S. 964 (1958) ("in considering a motion for summary judgment, the court is entitled to consider exhibits and other papers that have been identified by affidavit or otherwise made admissible in evidence").

While the non-moving party will bear the burden of proof at trial, the party moving for summary judgment may meet its burden by showing that the admissible evidence in the record would be insufficient to carry the non-movant's burden of proof at trial. *Celotex*, 477 U.S. at 322-323. Once the moving party satisfies its burden, the burden shifts to the nonmoving party, who must go beyond its pleadings, and designate specific facts by the use of affidavits, depositions, admissions, or answers to interrogatories showing that there is a genuine issue for trial. *Id.* at 324. The nonmoving party "cannot simply reassert factually unsupported allegations contained in its pleadings." *Williams v. Borough of West Chester*, 891 F.2d 458, 460 (3d Cir. 1989).

## CHOICE OF LAW

Preliminarily, the Court notes that jurisdiction in this case rests on the diversity of the parties. 28 U.S.C. § 1332(a)(1). A federal court sitting in diversity must apply the substantive law of the state in which it sits, *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938), including its choice of law rules, *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). Here, however, there is no dispute between the parties that Pennsylvania law applies to this case and thus the Court declines to engage in a choice of law analysis. *Rochez Bros., Inc. v. North American Salt Co., Inc.*, Civ. A. No. 94-1131, 1994 WL 735932, at *6 n.8 (W.D. Pa. 1994) (citing *Schiavone Construction Co. v. Time, Inc.*, 735 F.2d 94, 96 (3d Cir. 1984)) ("Because the parties appear to implicitly agree on the applicable choice of law, this Court will not challenge their decision").

## ANALYSIS

In its motion, Defendant requests summary judgment as to Plaintiffs' UTP/CPL claims.[19]

---

[19] The UTP/CPL's "underlying foundation is fraud prevention." *See Commonwealth v. Monumental Properties, Inc.,* 329 A.2d 812, 816 (Pa. 1974); *Weinberg v. Sun Co.*, 777 A.2d 442,

10

The UTP/CPL provides a private right of action to:

> Any person who purchases or leases goods or services primarily for personal, family or household purposes and thereby suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment by any person of a method, act or practice declared unlawful by section 3 of this act.[20]

73. P.S. §201-9.2(a). Section 3 provides that:

> Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce as defined by subclauses (i) through (xxi) of clause (4) of section 2 of this act and regulations promulgated under section 3.1 of this act are hereby declared unlawful.

73 P.S. §201-3. Plaintiffs allege violations of subclauses (ii), (vii) and (xxi) of Section 2 of the UTP/CPL. (Docket No. 32 at 20).

Pertaining to subclauses (ii)[21] and (vii),[22] recent case law provides guidance pertaining to the elements that a plaintiff must prove to succeed at trial under the UTP/CPL. As noted above, the

---

446 (Pa. 2001).

[20] The Court recognizes that investment securities, like the ones offered by Defendant, are not "goods" as defined under the UTP/CPL and the UTP/CPL does not provide a cause of action for a party alleging a fraud in the securities themselves. *Algrant v. Evergreen Valley Nurseries Ltd. Pshp.*, 126 F.3d 178, 187 (3d Cir. 1997). The sale of investment securities, however, can qualify as "services" under the UTP/CPL if fraud existed in the transaction in which the security was purchased. *Baker v. Summit Bank*, 64 F.Supp.2d 466, 468 (E.D. Pa. 1999) (providing that "securities are not 'goods' in the usual sense of the word and for their sale to be actionable as 'services,' the fraud must be in the transaction, not in the securities themselves.")

[21] Under Subclause (ii), one engages in unfair or deceptive acts or practices by "causing likelihood of confusion or of misunderstanding as to the source, sponsorship, approval or certification of goods or services." 73 P.S. §201-2(4)(ii).

[22] Pursuant to Subclause (vii), one engages in unfair or deceptive acts or practices by "representing that goods or services are of a particular standard, quality or grade, or that goods are of a particular style or model, if they are of another." 73 P.S. §201-2(4)(vii).

underlying foundation of the UTP/CPL is fraud prevention. *Weinberg,* 777 A.2d at 446. Furthermore, the Pennsylvania Supreme Court has consistently held that "to bring a private cause of action under the UTP/CPL, a plaintiff must show that he *justifiably relied* on the defendant's wrongful conduct or representation and that he suffered harm *as a result of* that reliance." *Yocca v. Pittsburgh Steelers Sports Inc.*, 854 A.2d 425, 438 (2004) (emphases added). *See also Weinberg*, 777 A.2d at 446 (providing that "nothing in the legislative history [of the UTP/CPL] suggests that the legislature ever intended statutory language directed against consumer fraud to do away with the traditional common law elements of reliance and causation"); *Toy v. Metropolitan Life Ins. Co.*, 928 A.2d 186, 201 (Pa. 2007) (construing *Weinberg* as to have settled that justifiable reliance on a misrepresentation is an element of UTP/CPL claims).[23] Despite the lack of case law on the specific elements a plaintiff must prove under subclauses (ii) and (vii), this Court finds that, pursuant to Pennsylvania law governing claims brought under the UTP/CPL, Plaintiffs must demonstrate, at a minimum, a false misrepresentation, justifiable reliance upon the misrepresentation, and causation.[24]

Turning to subclause (xxi), commonly known as the "catch-all" provision, one engages in unfair or deceptive acts or practices by "engaging in other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding." 73 P.S. §201-2(4)(xxi). Prior to the 1996

---

[23] Recently, the U.S. Court of Appeals for the Third Circuit has followed the Pennsylvania Supreme Court's interpretation that in a private cause of action, a plaintiff must show that he justifiably relied on a false misrepresentation and that he suffered harm as a result of that reliance. *See Tran v. Metropolitan Life Ins. Co.*, 408 F.3d 130, 140 (3d Cir. 2005); *Santana Products Inc. v. Bobrick Washroom Equipment Inc.*, 401 F.3d 123, 136 (3d Cir. 2005).

[24] The causation requirement under the UTP/CPL is express on the face of section 9.2. 73 P.S. §201-9.2(a) (affording a private right of action to those who suffer loss "as a result of" the use or employment of an act made unlawful by the UTP/CPL).

amendment to the UTP/CPL, when the words "or deceptive conduct" were added to subclause (xxi), a plaintiff alleging a violation of the catch-all provision had to establish all of the elements of common law fraud.[25] *Commonwealth v. Percudani*, 825 A.2d 743, 746 (Pa.Cmwlth. 2003). However, after the 1996 amendment to subclause (xxi), two divergent views have emerged regarding the effect of the addition of the words "or deceptive conduct," creating a split between Pennsylvania appellate courts as to what a plaintiff alleging a violation of the catch-all provision must establish at trial.[26] One view, espoused in multiple rulings by the Pennsylvania Superior Court, still requires a plaintiff to establish the elements of common law fraud to prove a claim under subclause (xxi). *See Colaizzi v. Beck*, 895 A.2d 36, 39 (Pa.Super. 1999) (providing that in order to establish a violation of the catch-all provision, a plaintiff must prove the elements of a common law fraud claim). *See also Skurnowicz v. Lucci*, 798 A.2d 788, 794 (Pa.Super. 2002) (citing *Sewak v. Lockhart*, 699 A.2d 755, 761 (Pa.Super. 1997); *Slapikas v. First American Title Ins. Co.*, 2008 WL 793919 (W.D.Pa. 2008) (requiring all elements of common law fraud to be met in order to succeed under a subclause (xxi) claim). A second view, proposed by the Pennsylvania Commonwealth Court, requires a showing of something less than fraudulent conduct. *See Commonwealth v.*

---

[25] Similarly to a UTP/CPL claim, the elements of a common law fraud claim are: (1) material misrepresentation of a material fact; (2) scienter; (3) intention by the declarant to induce action; (4) justifiable reliance by the party defrauded by the misrepresentation; and (5) damages to the party defrauded as a proximate result. *See Bauer v. Beneficial Consumer Discount Co.*, Civil Action No. 07-00247, 2007 WL 4269804, at *3 (W.D. Pa. Dec. 3, 2007) (citations omitted).

[26] Because the Pennsylvania Supreme Court has yet to rule on this issue, the Court must look to the decisions of intermediate state courts for guidance. *Fidelity Union Trust Co. v. Field*, 311 U.S. 169, 177-78 (1940) (finding that "an intermediate state court in declaring and applying the state law is acting as an organ of the State and its determination, in the absence of more convincing evidence of what the state law is, should be followed by a federal court in deciding a state question").

*Manson,* 903 A.2d 69, 73-74 (rejecting the interpretation that the post-1996 amendment requirements of subclause (xxi) still requires a showing of the elements of common law fraud); *see also In re Patterson*, 263 B.R. 82 (E.D.Pa.Bankr. 2001) (holding that the inclusion of the word "deceptive" in the subclause (xxi) necessitates a less restrictive standard of proof than common law fraud because to "require fraud would render the statute's addition of the word deceptive redundant"); *Commonwealth v. Percudani*, 825 A.2d 743, 747 (Pa.Commw. 2003) (predicting that the Pennsylvania Supreme Court would agree with the position adopted by the Bankruptcy Court in *In re Patterson*).[27]

Regardless of whether a less restrictive standard of proof applies as a result of the 1996 Amendments, which, the Court notes, Plaintiffs do not even assert,[28] Plaintiffs still must demonstrate the requirements of *any* claim brought under the UTP/CPL, as espoused by the Pennsylvania Supreme Court: (1) that the Defendant made a false misrepresentation; (2) which the Plaintiffs justifiably relied upon; and (3) suffered loss as a result of such reliance. *Toy*, 928 A.2d at 201. Having outlined the necessary elements for a violation of subclauses (ii), (vi), and (xxi), the Court will now address the same, in turn.[29] Here, the Plaintiffs are unable to meet their burden and survive

---

[27] The Court opines that even if a less restrictive standard of proof were adopted, it would still involve a misrepresentation on the part of a defendant. *In re Fisher*, 320 B.R. 52, 49 (E.D. Pa. 2005) (finding that a deception standard under the UTP/CPL would require plaintiff to establish that defendant made a false misrepresentation that deceived, or had a tendency to deceive).

[28] The Court also notes that the Plaintiffs failed to plead deceptive conduct on the part of Defendant. Furthermore, in their Opposing Response Brief, Plaintiffs note that UTP/CPL claims must plead the same elements of common law fraud. (Docket No. 54 at 7).

[29] Because the Court finds that Plaintiffs cannot meet their burdens as to misrepresentation and causation, the Court declines to address justifiable reliance.

Defendant's motion for summary judgment.

### 1. Misrepresentation

In order to qualify as "services," and thus afford protection under the UTP/CPL, any fraud involving securities must exist in the security transaction itself. *Baker,* 64 F.Supp.2d at 468. Therefore, only fraud relating to the actual sale, and not the security itself, is covered by the UTP/CPL. *Id.* Here, Plaintiffs admit that Defendant made no misrepresentations of fact with respect to the mutual funds they purchased from Defendant.[30] Defendant's Facts at ¶56. Plaintiffs also do not claim that any of the prospectuses received from Defendant, contained any false misrepresentations. Furthermore, Plaintiffs have admitted that the Defendant's representatives were always "very good" at explaining the mutual funds that Mr. Cehula was interested in purchasing. Defendant's Facts at ¶55.

Assuming that the Plaintiffs construe the alleged guarantee that their accounts would reach a value of $10 million in the future as a false misrepresentation, which they do not plead, the Court finds no evidence of record to demonstrate that any such representation, if made, was false or misleading. The $10 million guarantee allegedly took place in late winter of 2001 and the Plaintiffs liquidated their accounts with Defendant on January 24, 2003. Defendant's Facts at ¶57-58.

---

[30] Plaintiffs also claim that while their investments were held with Defendant, Defendant misrepresented that a personal investment advisor would be provided to assist Plaintiffs with managing their holdings with Defendant. (Docket No. 54-3 at ¶26). Plaintiffs, however, have admitted that Defendant made no misrepresentations of fact associated with any of their mutual funds held with Defendant. Defendant's Facts at ¶56. Also, the Court can find no instance in any of Plaintiffs' filings with this Court in which Plaintiffs claim that the denial of a personal investment advisor caused any of the losses complained of. As discussed below, causation is an essential element to any UTP/CPL claim.

According to Mr. Cehula, he was given no time frame as to when their accounts would reach this potential value. Defendant's Facts at ¶78. Moreover, Mr. Cehula admits that he knew it would take some time for his investments to reach $10 million. Defendant's Facts at ¶70. Finally, when Plaintiffs liquidated their accounts on January 24, 2003, less than two years after the alleged $10 million guarantee, Mr. Cehula admits the decision to liquidate was based on the combination of the market becoming stagnant and his becoming tired of waiting for his investments to grow. Defendant's Facts at ¶60, 91.[31]

Based on Plaintiffs' admissions, and the competent evidence of record, one cannot reasonably find that Defendant misrepresented anything that either: (1) "caused a likelihood of confusion or of misunderstanding as to the source, sponsorship, approval or certification of goods or services," (2) represented "that goods or services [were] of a particular standard, quality or grade, or that goods were of a particular style or model, [when] they [were] of another," or (3) engaged in any other fraudulent or deceptive conduct which created a likelihood of confusion or of misunderstanding." 73 §§P.S. 201-2(4)(ii),(vii),(xxi). The lack of any evidence supporting a finding that a misrepresentation was made is fatal to Plaintiffs' UTP/CPL claims.

### 2. Causation

Just as Plaintiffs cannot successfully demonstrate that a misrepresentation on the part of the

---

[31]

Furthermore, Plaintiffs chose not to retain an expert or depose any representative of Defendant in order to demonstrate that any guarantee was, in fact, a misrepresentation based on the Plaintiffs' holdings with Defendant. Nor did the Plaintiffs put before the Court any expert report or testimony. Said evidence would have assisted the Court in determining whether representations made to Plaintiffs were false. *See* Wigmore on Evidence, 3rd Ed., Vol. VII, § 2090 (where a topic requires special experience, only the testimony of a person of that special experience will be received).

16

Defendant was made at the time of any sale or other transaction of funds with the Defendant, Plaintiffs cannot meet their burden of demonstrating that the conduct allegedly causing their losses is actionable under the UTP/CPL.[32] Plaintiffs allege that their losses are a result of Defendant's refusal to honor a sell order during the late winter 2001 phone call in which Mr. Cehula was also given the alleged $10 million guarantee.[33] (*See* Docket No. 32 at ¶¶25-26) (alleging that at some point in time, the Plaintiffs requested to be sold out of all Janus Funds, that the Defendant refused to do so, and that this refusal "caused the vast majority of the losses complained of today").

In order to succeed under the UTP/CPL, a plaintiff must be able to establish that an alleged misrepresentation by a defendant caused their loss. *Weinberg v. Sun Co.*, 740 A.2d at 1169. Setting aside the fact that Plaintiffs have admitted that Defendant made no misrepresentations of fact in the first place, Plaintiffs have not presented evidence that establishes that their losses were a result of misrepresentations made by the Defendant, whether those misrepresentations be in the form a $10 million guarantee or the denial of a personal investment advisor. Instead, Plaintiffs claim that their losses were suffered as a result of Defendant's refusal to sell them out of their mutual funds. (Docket No. 32 at ¶¶25-26).

Under the UTP/CPL, a plaintiff is only protected from a defendant's malfeasance, defined

---

[32] The Court opines that perhaps a breach of contract or common law fraud claim would have been more appropriate. Nonetheless, Plaintiffs withdrew such claims as in all likelihood the statute of limitations would bar any such claims.

[33] The Court notes that, according to Mr. Cehula, he ultimately chose not to sell any of his funds during this phone call. (S. Cehula Deposition at 132:23-25; 133:1-4).

as the improper performance of a contractual obligation.[34] *See Meyer v. Cuna Mut. Group*, Civil Action No. 03-602, 2007 WL 2907276, at *11 (W.D. Pa. Sept. 28, 2007) (citing *Horowitz v. Federal Kemper Life Assur. Co.*, 57 F.3d 300, 307 (3d Cir. 1995). The UTP/CPL does not protect a plaintiff from nonfeasance, defined as the failure to perform a contractual obligation. *See Meyer*, 2007 WL 2907276, at *11 (citing *Gordon v. Pennsylvania Blue Shield*, 548 A.2d 600, 604 (Pa.Super. 1988)). Accordingly, a defendant's improper performance of a contractual obligation is protected by the UTP/CPL, while its failure to perform a contractual duty is not. *See Fass v. State Farm Fire and Cas. Co.*, Civil Action No. 06-02398, 2006 WL 2129098, at *2 (E.D. Pa. July 26, 2006) (providing that "the UTPCPL only protects plaintiffs against a defendant's malfeasance; nonfeasance is not covered by the statute"). Consequently, even assuming that the Defendant's failure to honor a sell order from the Plaintiffs caused their alleged losses, this failure is not actionable under the UTP/CPL.[35]

---

[34] Defendant's obligation to implement sell orders of its account holders arises out of a contractual relationship between it and its account holders.

[35] The Court also recognizes that in order to succeed under the UTP/CPL, a plaintiff must further show that he justifiably relied on the defendant's wrongful conduct. *Toy*, 928 A.2d at 201. A recipient of an allegedly fraudulent misrepresentation is under no duty to investigate its falsity in order to justifiably rely, but he is not justified in relying upon the truth of an allegedly fraudulent misrepresentation if he knows it to be false or if its falsity is obvious. *Id.* at 208. Mr. Cehula has more than twenty years of experience with investing in the stock market and admitted that he thought the alleged $10 million guarantee was improper at the time. Defendant's Facts at ¶¶47-50, 84. Notwithstanding the Court's findings that Plaintiffs have admitted that Defendants made no misrepresentation and that Plaintiffs have failed to demonstrate causation, the Court opines that, based on Mr. Cehula's experience with the securities market as well as his belief regarding the impropriety of the alleged guarantee, the falsity of the alleged misrepresentation is obvious in this instance.

## CONCLUSION

Because Plaintiffs are unable to establish the existence of a false misrepresentation on the part of Defendant or that their losses were caused by an actionable event under the UTP/CPL, Defendant is entitled to summary judgment with respect to Plaintiffs' UTP/CPL claims.

Accordingly, based on the foregoing, Defendant Janus Distributors LLC's Motion for Summary Judgment [50] is GRANTED.  An appropriate order to follow.

*s/ Nora Barry Fischer*
Nora Barry Fischer
United States District Judge

Date: July 23, 2008
cc: All counsel of record